# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| GENE HARRIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| -vs- | ) Case No. CIV-05-682-F |
| | ) |
| INDUSTRIAL BUILDING SERVICES LLC, | ) |
| | ) |
| Defendant. | ) |

## <u>O R D E R</u>

Before the court is defendant, Industrial Building Services' Motion for Summary Judgment, filed December 1, 2005 (doc. no. 21). With leave of court, plaintiff, Gene Harris, responded to defendant's motion on December 30, 2005 (doc. no. 28). Defendant filed a reply, with leave of court, on January 17, 2006 (doc. no. 32). Having reviewed the parties' submissions and the applicable law, the court makes its determination.

<u>Complaint and Standard of Review</u>

Plaintiff, Gene Harris ("Harris"), commenced this diversity action on June 15, 2005. In his complaint, Harris alleges that his employer, defendant, Industrial Building Services ("IBS"), terminated his employment in violation of the anti-retaliation provision of the Oklahoma Workers' Compensation Act, Okla. Stat. tit. 85, § 5(A). IBS, in the instant motion, seeks summary judgment on Harris' retaliatory discharge claim.

Under Federal Rule of Civil Procedure 56(c), summary judgment shall be granted if the record shows that, "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The

moving party has the burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In determining whether a genuine issue of a material fact exists, the evidence is to be taken in the light most favorable to the non-moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials, demonstrating that there is a genuine issue for trial. Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir. 1983).

Background

The relevant facts, taken in a light most favorable to Harris, are as follows. IBS is in the business of providing heating and air conditioning installation, preventative maintenance and service call work for large business chains. Harris was hired by IBS in February of 2004 as a heat, ventilation and air conditioning ("HVAC") technician. Exhibit 1 to IBS' motion, Harris deposition, p. 28, ll. 6-11; p. 31, ll. 16-19; p. 38, l. 15. Harris' supervisor was Erin Wolf ("Wolf"), IBS' branch manager. Exhibit 1 to Harris' response, Harris deposition, p. 44, ll. 13,14. In addition to Harris, Wolf supervised two other Oklahoma HVAC technicians, James Morgan ("Morgan") and Wesley Wright ("Wright"). Id. at p. 50, ll. 20-25; p. 51, l. 1; Exhibit 19 to IBS' motion, Affidavit of James G. Morgan, ¶¶ 3, 4.

On Friday, April 23, 2004, Harris sustained an injury to his back, while moving an air conditioning unit at a customer location. Exhibit 1 to IBS' motion, Harris deposition, p. 65, ll. 16-19; p. 94, ll. 6-9. Later that day, Wolf called Harris and told him that he needed him to work on Saturday (not a regularly scheduled work day) to finish the job at the customer location. Harris however told Wolf, "I

hurt myself, and I can't do it." *Id*. at p. 66, ll. 14-17; Exhibit 1 to Harris' response, Harris deposition, p. 93, ll. 20-24.[1]  According to Harris, Wolf "got hot because he wanted that job done." Exhibit 1 to IBS' motion, Harris deposition, p. 66, l. 18.  In addition, Wolf "[threw] a fit, hung up the phone." *Id*. at p. 66, l. 22-23.

On Monday, April 26, 2004, Wolf showed up at the job site "madder than heck" asking "Why isn't the job done?"  Exhibit 1 to IBS' motion, Harris deposition, p. 94, ll. 4-5.  Harris responded, "[c]ause I can't do it, you know." *Id*. at 94, l. 6.  Harris thereafter informed Wolf that he needed to see a doctor.  Wolf told Harris "well, fine, then go." *Id*. at  p. 70, ll. 7-10; p. 95, ll. 24-25.

After waiting to see if Wolf would take action in regard to his injury and waiting for his insurance to start, Harris eventually went to the doctor on June 1, 2004.  Exhibit 1 to IBS' motion, Harris deposition, p. 95, ll. 1-8.  The doctor imposed a work restriction of no lifting over 15 pounds.  Exhibit 1 to Harris response, Harris deposition, p. 46, ll. 1-25.  Harris immediately advised Wolf of the work restriction. *Id*.  at p. 48, ll. 2-6.  Although offering to send assistance in response to Harris' requests not to work outside his work restriction, Wolf never sent another HVAC technician to help Harris. *Id*. at p. 52, ll. 7-17.  Eventually, Harris placed a call to Ms. Joanne Brozic, the head of personnel for IBS, informing her that Wolf was "not abiding by [Harris'] medical restrictions." *Id*. at p. 45, ll. 14-15.  Ms. Brozic responded that Harris would "need to take that up with [Wolf]." *Id*. at p. 45, ll. 16-17.

After his first visit to the doctor in June of 2004, Harris told Wolf that if Wolf wasn't going to do something about his injury, he would have to hire an

---

[1] In its employee handbook, IBS advised its employees to immediately report any work-related injury or illness to a supervisor.  Exhibit 7 to IBS' motion, Service Experts Employee Handbook, "Workers Compensation."

attorney. Exhibit 1 to Harris' response, Harris deposition, p. 98, ll. 8-10. He also told him that he was planning to file a workers' compensation claim. *Id*. at p. 97, ll. 17-20. In regard to Wolf's response, Harris testified:

> A. I don't think he even heard me, you know. He just - -
>
> Q. Physically didn't hear you or - -
>
> A. No, he just - - he looked at me and talked to me, but I just don't think it registered. He's got  - - he had too much going on, you know, and that's - - I sat down, and I talked to [Wright]. I said, how do I make [Wolf] listen to me?
>
> Q. So he didn't tell you no, we're not going to take care of you, he just didn't say anything that made you feel like he was saying something one way or the other?
>
> A. Yeah, he just ignored me. He ignored me the whole way through.

*Id*. at p. 98, l. 25; p. 99, ll. 1-11. After the June comment to Wolf, Harris attempted a "bunch of times" to get Wolf to work with him in regard to his injury. *Id*. at p. 99, l. 20. Harris testified that he told Wolf he was going to doctors and getting MRIs, and it was going on his insurance. He also told Wolf that he was having to pay deductibles out of his own pocket. *Id*. at p. 99, ll. 20-24.

On July 13, 2004, Bill Mercier ("Mercier"), regional manager for IBS' operations in Oklahoma went to a customer location in Oklahoma City where Harris was performing preventative maintenance work. Mercier was accompanied by Wolf. During his inspection of Harris' work, Mercier found several problems with the unit Harris was servicing, including a loose belt, a worn pulley, missing or deteriorating fresh air screens, and burnt wires on the contactor. An exception report was issued which indicated the problems Mercier found with the unit. Exhibit 15 to IBS' motion. Mercier told Harris that the problems needed to be corrected. Exhibit 1 to IBS' motion, Harris deposition, p. 106, ll. 7-14; p. 107, ll.

2,3. According to Harris, he had just "got [to the location]" and "hadn't had the chance to perform [his] maintenance." *Id*. at p. 106, ll. 22,23.

On July 16, 2004, Harris performed a service call at a body shop in Norman. Harris had been called to repair an air conditioning unit because it was not cooling. Exhibit 1 to IBS' motion, Harris deposition, at p. 123, ll. 9-20. The very next day, James Morgan, one of the other HVAC technicians supervised by Wolf, was called back to the same body shop because the air conditioning unit was still not cooling properly. To fix the problem, Morgan had to change out the compressor contactor, replace the outdoor fan motor, remove some stopped-up filters, and clean several condenser coils. *Id*. at p. 125, ll. 7-19; Exhibit 19 to IBS' motion, Affidavit of James G. Morgan, ¶ 7; Exhibit 18 to IBS' motion. Morgan discussed the body shop incident with Wolf. Exhibit 19 to IBS' motion, Affidavit of James G. Morgan, ¶ 9. According to Harris, Wolf consistently failed to allow him enough time to adequately complete necessary preventative maintenance tasks assigned to him and "[t]here were numerous occasions where I was called out to perform service on a unit which had been worked on in the preceding 72 hours by a different IBS tech, either Mr. Wright or Mr. Morgan." Exhibit 4 to Harris' response, Affidavit of Gene Harris, ¶ 4.

On July 19, 2004, Harris received an "Employee Counseling" document in regard to his preventative maintenance work. As to the details of the counseling, Harris stated in his own handwriting: "I have slacked on some of the [preventative maintenance work]. I will correct it." Exhibit 16 to IBS' motion, IBS' Employee Counseling form. For the employee comments, Harris stated in his own handwriting: "[s]pend more time on [preventative maintenance work] to insure quality[;] have 2nd Tech in OKC, 2 Techs in Tulsa." *Id*. Morgan and Wright received similar disciplinary documents. Exhibit 1 to IBS' motion, Harris

5

deposition, p. 107, l. 20; Exhibit 4 to Harris' response, Affidavit of Gene Harris, ¶ 2.

On August 2, 2004, an exception report was issued in regard to an air conditioning unit serviced by Harris at a customer location in Oklahoma City. Exhibit 20 to IBS' motion. The report and pictures attached thereto indicated some problems with the unit. One of the problems was that certain air conditioning parts, which had originally been painted green, were painted red. IBS uses different colors of paint on air conditioning parts to designate the years that the parts were last replaced. Exhibit 19 to IBS' motion, Affidavit of James G. Morgan, ¶ 10. The 2003 parts were painted green and the 2004 parts were painted red. *Id.* Harris denied painting over the green painted parts with red paint. Exhibit 1 to IBS' motion, Harris deposition, p. 142, ll. 11, 12.

Two weeks prior to his termination on August 9, 2004, Harris retained an attorney to represent him on the workers' compensation claim. Exhibit 1 to Harris' response, Harris deposition, p. 61, ll. 20-22. Within four days thereafter, Harris notified Wolf by telephone that he had retained counsel. *Id.* at p. 61, ll. 23-25, p. 62, ll. 1-3. Wolf told Harris that he was "wasting his time" by hiring a lawyer. *Id.* at p. 62, l. 12.

On August 9, 2004, Harris was terminated for alleged unsatisfactory work performance. Exhibit 1 to IBS' motion, Harris deposition, p. 59, ll. 17-19; p. 80, ll. 3-6, Exhibit 4 to Harris' response, Affidavit of Gene Harris, ¶ 3.

On August 23, 2004, Harris filed a workers' compensation claim against IBS. Exhibit 1 to IBS' motion, Harris deposition, p. 119, ll. 1-3.

Discussion

Because this case arises from diversity jurisdiction under 28 U.S.C. § 1332, the court must look to Oklahoma law to resolve Harris' claim. Blackwell v.

Shelter Mutual Insurance Company, 109 F.3d 1550, 1553 (10th Cir. 1997). Okla. Stat. tit. 85, § 5(A) prohibits the employer from discharging an employee because the employee has in good faith filed a claim; retained a lawyer for representation regarding a claim; instituted or caused to be instituted any proceeding under the Workers' Compensation Act; testified or is about to testify in any proceeding under the Workers' Compensation Act; and elected to participate or not to participate in a certified workplace medical plan. To establish *a prima facie* case of retaliatory discharge under section 5, the plaintiff must prove the following four elements (1) employment, (2) on-the-job injury, (3) receipt of treatment under circumstances which should put the employer on notice that treatment had been rendered for a work-related injury, or that the employee in good faith instituted, or caused to be instituted proceedings under the Workers' Compensation Act, and (4) consequent termination. Buckner v. General Motors Corp., 760 P.2d 803, 806 (Okla. 1988). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant employer to rebut the inference of a retaliatory motive by articulating a legitimate, non-retaliatory reason for the termination. Blackwell, 109 F.3d at 1554 (citing Buckner, 760 P.2d at 806). The defendant's burden is simply one of production, not persuasion. *Id*. (citing Buckner, 760 P.2d at 807). If the defendant satisfies this burden, the presumption of retaliatory motive is successfully rebutted. *Id*. At that point, the plaintiff can only prevail by proving his termination was significantly motivated by retaliation for his exercise of statutory rights, or by proving the defendant's proffered reason for the discharge was pretextual. *Id*.

*Prima Facie* Case

     In the instant case, IBS does not dispute that Harris can establish the first two elements of the *prima facie* case. The focus of IBS' motion is on the third and fourth elements - whether Harris received treatment under circumstances that put

IBS on notice that treatment had been rendered for a work-related injury or that Harris, in good faith, instituted or caused to be instituted proceedings under the Workers' Compensation Act and whether a consequent termination occurred.

In <u>Buckner</u>, the Oklahoma Supreme Court concluded that the phrase "instituted or cause to be instituted any proceeding," must be construed to mean more than the mere filing of a claim.  <u>Buckner</u>, 760 P.2d at 809.  The question before the Court was whether the receipt of medical treatment by the employee at the job site by a physician provided by the employer constituted the institution of proceedings for purposes of stating a *prima facie* case.  *Id*. at 810.  The Court held that the employee had stated a *prima facie* case.  In so ruling, the Court stated:

> Merely seeking and receiving first aid is not in and of itself sufficient to institute proceedings.  Some other evidence sufficient to persuade the trier of fact that the worker intended or reasonably could have intended to institute proceedings is necessary . . . *First aid coupled with circumstances which raise a clear inference of an anticipated claim must be present before the institution of proceedings is triggered*.  For now, we simply conclude that the provision of medical treatment by the employer, when accompanied by circumstances . . . which would lead a reasonable employer to infer that a workers compensation claim would in all probability ensue, constitutes the institution of proceedings.

*Id*. at 811 (emphasis added).

Viewing the evidence in a light most favorable to Harris, the court concludes that Harris has presented sufficient evidence to establish the institution of proceedings for purposes of stating a *prima facie* case.  Although Harris did not receive first aid from his employer, Harris notified Wolf, his immediate supervisor, that he had been injured at the job site and needed to see a doctor.  Exhibit 1 to Harris' response, Harris deposition, p. 93, ll. 20-24.  Wolf told Harris to go to the doctor.  *Id*. at p. 70, ll. 7-10; p. 95, ll. 24-25.  Harris then advised Wolf of the work

restriction imposed by his physician. *Id*. at p. 48, ll. 2-6. Thereafter, Harris told Wolf that if he didn't work with him in regard to his injury, he would need to hire an attorney. Although Harris testified in deposition that he didn't think the attorney comment registered with Wolf, Harris also testified that after that comment, he attempted a "bunch of times" to get Wolf to work with him in regard to his injury. *Id*. at p. 99, l. 20. Harris further testified that he advised Wolf that his doctor visits were being paid by his own medical insurance and he was having to pay the deductibles out of his own pocket. *Id*. at p. 99, ll. 20-24. Finally, approximately 10 days before his termination, Harris told Wolf that he had hired a workers' compensation attorney. *Id*. at p. 61, ll. 23-25; p. 62, ll. 1-3. The court concludes that this evidence, viewed in a light most favorable to Harris, is sufficient to demonstrate that IBS was aware of "circumstances which would lead a reasonable employer to infer that a workers compensation claim would in all probability ensue." Buckner, 760 P.3d at 811. The facts, in the court's view, are sufficient to find that Harris has satisfied the third element of his *prima facie* case.

In order to establish the fourth element of the *prima facie* case, consequent termination, Harris must produce evidence sufficient to support a legal inference that his termination was "significantly motivated" by retaliation for exercising his statutory rights. Blackwell, 109 F.3d at 1554(footnote omitted) (citing Wallace v. Halliburton Co., 850 P.2d 1056, 1058 (Okla. 1993) and Taylor v. Cache Creek Nursing Centers, 891 P.2d 607, 610 (Okla. App. 1994)). In his briefing, Harris does not specifically identify and/or discuss the evidence which he claims establishes the consequent termination element. He only states "'[c]onsequent termination,' for purposes of the *prima facie* case, is established through the evidence in this record." Harris' response, p. 13.

The court notes that, to establish consequent termination, Harris must show more than temporal proximity between his termination and his institution of proceedings under the Oklahoma Workers' Compensation Act. Thompson v. Medley Material Handling, Inc., 732 P.2d 461, 464 (Okla.1987) and Taylor, 891 P.2d at 610 (finding that evidence that the employee was fired shortly after the protected activity, by itself, is insufficient to raise a legal inference that the firing was significantly motivated by the retaliation). Having examined the evidence in the record in a light most favorable to Harris, the court does not believe that a reasonable jury could conclude his termination was significantly motivated by retaliation for instituting proceedings under the Oklahoma Workers' Compensation Act. The court concludes that the evidence of Wolf's expression of anger in response to Harris' report of injury; Wolf's indifference to Harris' work restriction; Wolf's failure to send assistance to Harris when requested and Wolf's comment that Harris was "wasting his time" hiring a lawyer, along with Wolf's decision to terminate within 10 days of the attorney comment, is not sufficient to establish a nexus between the termination and the exercise of statutory rights. Blackwell, 109 F.3d at 1556. The court concludes that the evidence in the record does not have sufficient probative value to constitute the basis for a legal inference that Harris' termination was motivated by retaliation for exercising his statutory rights. In the court's view, any reasons for Harris' discharge, other than as stated by IBS, can only be deduced by pure speculation. Thompson, 732 P.2d at 464.

In the Taylor v. Cache Creek Nursing Centers case, the defendant fired the plaintiff immediately after returning from a two-week, doctor-ordered disability leave. Taylor, 891 P.2d at 609. The appellate court found that the plaintiff could not establish a *prima facie* case because the plaintiff failed to show her termination was a consequence of filing a workers' compensation claim. *Id*. at 610. Important

10

to its decision, the court found no evidence "showing a pattern of termination of workers who filed [workers' compensation] claims, or of pressure put on workers not to file claims." *Id*. The court also found no allegation of the supervisor or other employer representative referring to the claim. *Id*. Furthermore, the court concluded the fact that the plaintiff was fired immediately after returning from disability leave was insufficient to raise a legal inference that the termination was significantly motivated by retaliation. *Id*.

Similarly, in the Thompson v. Medley Material Handling, Inc. case, the defendant fired the plaintiff six weeks after the plaintiff filed a workers' compensation claim for an on-the-job injury. Thompson, 732 P.2d at 464. Notwithstanding the temporal proximity of the claim to the termination, the court held that the plaintiff failed to establish that the filing of the claim had any effect on the defendant's decision to terminate his employment. The court noted that the plaintiff did not allege that his supervisors or others at any time made any reference regarding termination as a result of bringing the workers' compensation claim. *Id*.

In the instant case, as in the Taylor case, there is no evidence that IBS engaged in a pattern of terminating or otherwise discriminating against employees who engaged in protected activity under the Oklahoma Workers' Compensation Act. Also, as in Taylor, there is no evidence that Wolf ever advised Harris or put any pressure on Harris to not file a claim. Although Wolf told Harris he was "wasting his time" in hiring a lawyer, the court concludes that such comment, even when viewed in a light most favorable to plaintiff, does not show that Wolf was pressuring Harris or otherwise seeking to prevent Harris from filing a claim. Furthermore, as in Taylor and Thompson, there is no allegation that Wolf made any reference to the claim in regard to his decision to terminate Harris' employment.

In the <u>Wallace v. Halliburton Co.</u> case, the Oklahoma Supreme Court found sufficient evidence to establish "consequent termination." <u>Wallace</u>, 850 P.2d at 1059. This evidence included: (1) plaintiff's firing 37 days after filing his claim; (2) supervisors knowing of his injury and claim; (3) plaintiff, prior to his injury, being rated competent or commendable in most areas of his work and recently receiving a promotion and raise; (4) employees being encouraged to file work related injuries under defendant's self-health insurance rather than under workers' compensation; (5) plaintiff and another employee filing for previous injuries under their health insurance rather than applying for workers' compensation; (6) a supervisor from a different plant being mad when employee said he was going to file a workers' compensation claim; (7) plaintiff and another employee saying they were worried about being discharged if they filed a claim for workers' compensation; (8) other employees being less qualified than plaintiff but not filing workers' compensation claims were not let go; and (9) a pattern of defendant terminating employees filing workers' compensation claims. *Id*.

In the case at bar, the only evidence similar to that found in <u>Wallace</u> is the short time period between Harris' firing and his notification of hiring a lawyer and Harris' supervisor's knowledge of Harris' injury. Again, there is no evidence of a pattern of terminating employees who filed workers' compensation claims or any employee being worried about being discharged for filing a workers' compensation claim. *See also*, <u>Pettit v. Dolese Brothers Co.</u>, 943 P.2d 161, 164 (Okla. Civ. App. 1997) (testimony from co-worker that he did not file a workers' compensation claim because "'[a]t the time you could be terminated if you filed'" for compensation benefits). In addition, there is no evidence of any supervisor being mad at an employee for filing a workers' compensation claim or making any comments to an employee related to the filing of a workers' compensation claim.

12

*See also*, Mosley v. Truckstops Corp. of America, 891 P.2d 577, 585 (Okla. 1993)(employer informed employee if he filed a workers' compensation claim he could be fired for not following employer's procedure); Elzey v. Forrest, 739 P.2d 999, 1003 (Okla. 1987)(employer informing employee that employee would be jeopardizing his employment if continued to see doctors whose practices were significantly associated with workers' compensation claimants and employer informing employee he was being discharged for filing a workers' compensation claim); Pettit, 943 P.2d at 164(testimony from another co-worker that employer quit talking to him when he hired an attorney to handle workers' compensation claim and next response from employer was a termination letter); Mantha v. Liquid Carbonic Industries, Inc., 839 P.2d 200, 204 (Okla. Civ. App. 1992) (statement by co-worker who was to be drivers' new boss that workers' compensation claims would not be tolerated and statement by district manager to drivers that if they thought they were going to get rich filing workers' compensation claims they had better think again). Likewise, there is no evidence of workers being encouraged to file work-related injuries under IBS' or the workers' health insurance. Furthermore, there is no evidence of Harris receiving a favorable rating or receiving a promotion prior to and/or after injury. *See also*, Elzey, 739 P.2d at 1003(employer praising employee's job performance after returning from injury); Gussa v. J. Morris and Associates, Inc., 12 P.3d 473, (Okla. Civ. App. 1999)(one of the owners of employer company testified employee was good worker).[2]

---

[2]The court notes that there is evidence that Morgan and Wright also received disciplinary reports on July 19, 2004, but were not fired. However, as hereinafter discussed, this evidence does not have sufficient probative value as the evidence reveals that on August 2, 2004, an exception report was issued as to a customer location serviced by Harris and Wolf also relied upon that August incident in terminating Harris.

Viewing the evidence in a light most favorable to Harris, the court cannot conclude that the evidence is sufficient to support a legal inference that Harris' discharge was significantly motivated by retaliation for exercising his statutory rights. The evidence does not demonstrate that Harris' termination and his institution of proceedings under the Oklahoma Workers' Compensation Act were at all connected. Although Harris does not need to present evidence to meet a "but for" standard, *see*, Wallace, 850 P.2d at 1059, he must present evidence which does more than show that the institution of proceedings was "only one of many possible factors resulting in his discharge." *Id*. The evidence in the record does not demonstrate that Harris' institution of proceedings was more than one of many possible factors resulting in his termination. Thus, the court concludes that Harris cannot establish "consequent termination" and cannot establish a *prima facie* case of retaliatory discharge.

Even if the court were to find that Harris can establish a *prima facie* case, the court concludes that Harris cannot establish that he was a victim of retaliatory discharge. In its motion, IBS has produced sufficient evidence of a facially legitimate, non-retaliatory reason for terminating Harris - - unsatisfactory work performance. IBS' motion, Undisputed Material Facts, ¶¶ 19-23; 25; *see also*, Buckner, 860 P.2d at 807(employer must set forth clearly, through the introduction of admissible evidence, the reasons for the employee's termination.) Because IBS has met its burden of production, the presumption of the *prima facie* case is rebutted and the factual inquiry proceeds to a new level of specificity. Bishop v. Hale-Halsell Co., Inc., 800 P.2d 232, 234 (Okla. 1990). To avoid summary judgment, Harris must demonstrate that a genuine issue of material fact exists concerning whether Harris has shown that either his termination was significantly motivated by retaliation for his exercise of statutory rights, or that IBS' proffered

explanation is unworthy of belief. *Id*. Harris initially contends that the evidence establishes a genuine issue of fact as to whether IBS' stated explanation was unworthy of belief. Harris specifically points to evidence that all three HVAC technicians were disciplined for unsatisfactory work performance and received similar disciplinary reports on July 19, 2004, but that only he, who had been injured and had instituted proceedings under the Oklahoma Workers' Compensation Act, was fired. The court, however, concludes that this evidence is not sufficient to show that IBS' stated explanation is unworthy of belief. The record reveals that after the July 19, 2004 discipline, an exception report was issued showing a variety of problems at a customer location serviced by Harris. Exhibit 1 to IBS' motion, Harris deposition, p. 140, ll. 3-25; p. 141, ll. 1-25; p. 142, ll. 1-18. The evidence also reveals that Wolf specifically referred to this incident in terminating Harris. *Id.*, p. 158, ll. 11-18. However, there is no evidence of any additional problems or concerns with Wright and/or Morgan's work performance after the issuance of the July 19, 2004 disciplinary reports. Therefore, the court concludes that the fact that Wright and Morgan received similar disciplinary reports in July 2004, but that only Harris was fired, does not raise a genuine issue of fact as to whether IBS' stated explanation for Harris' termination is unworthy of belief.

Harris also seeks to establish that he was a victim of retaliatory discharge by demonstrating directly that his termination was significantly motivated by retaliation for his exercise of statutory rights. Harris specifically relies upon evidence of "Wolf's reaction when Harris reported his injury, Wolf's repeated indifference to Harris' requests for assistance with regard to the injury, Wolf's refusal to honor Harris' medical restrictions, Wolf's negative comments about Harris hiring counsel for the workers' compensation matter, and the fact that the

other two Oklahoma area HVAC's were disciplined for unsatisfactory work performance on July 19, 2004" and the timing of his discharge. Harris' response, p. 15. However, the court finds that this evidence, even when viewed in a light most favorable to Harris, does not raise a genuine issue of fact as to whether Harris' discharge was significantly motivated by retaliation for his exercise of statutory rights.

On the basis of Harris' inability to establish consequent termination and his inability to demonstrate that he was a victim of retaliatory discharge, the court concludes that IBS is entitled to summary judgment on Harris' retaliatory discharge claim.

Conclusion

Based upon the foregoing, defendant, Industrial Building Services' Motion for Summary Judgment, filed December 1, 2005 (doc. no. 21), is **GRANTED**. Judgment shall issue forthwith.

IT IS SO ORDERED this 6th day of February, 2006.

_____
STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

05-0682p009(pub).wpd